955 P.2d 951

**Jane DOE, a single person,
Plaintiff–Appellant.**

v.

**John ROE and Jane Roe, husband and
wife, Defendants–Appellees.**

No. CV–96–0526–PR.

Supreme Court of Arizona,
En Banc.

April 7, 1998.

Muchmore & Wallwork, P.C. by Margaret F. Dean, Nicholas J. Wallwork, Phoenix, for Jane Doe.

Renaud Cook & Drury, P.A. by Steven G. Mesaros, Diane L. Mihalsky, William W. Drury, Jr., Phoenix, for John Roe.

Broening Oberg Woods Wilson & Cass, P.C. by Jerry T. Collen, Terrence P. Woods and Thomas & Elardo by Neal B. Thomas, Phoenix, for Jane Roe.

## OPINION

FELDMAN, Justice.

¶ 1 We granted review to determine how the statute of limitations applies to a case of delayed discovery attributable to alleged repressed memory of severe sexual abuse. Plaintiff claims that after many years she recalled the abuse but for a prolonged period was incapacitated to the point of being unable to assert her legal rights. We examine application of both the discovery rule and the tolling statute. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3) and Ariz. R.Civ.App. 23.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Jane Doe (Plaintiff) alleges that her father sexually abused her during the years 1963 to 1970 when she was between the ages

of eight and fifteen. Because of the trauma associated with the abuse, Plaintiff completely repressed all memory of the events.

¶ 3 Plaintiff alleges that until 1989, she regarded her mother and father as ideal parents and considered them her best friends. Plaintiff had never seen a therapist or required psychiatric treatment, although she did suffer from eating disorders. As an adult, Plaintiff had only sparse and vague memories of her childhood, except for time spent with her paternal grandparents, with whom she was very close. Plaintiff's paternal grandmother died in late 1988 and her paternal grandfather died in March 1989. A few months later, while watching a television program that examined the issue of incest, Plaintiff experienced a flashback memory of her father sexually assaulting her.

¶ 4 As a result, Plaintiff developed feelings of hysteria, even panic, and immediately sought counseling. In the first emergency therapy session, Plaintiff alluded to the flashback she experienced earlier that day. However, during the next six months of therapy (first weekly then twice per week), Plaintiff could not discuss any specific incidents of sexual abuse. During this period Plaintiff experienced feelings of guilt, shame, self-doubt, depression, suicidal ideation, and ultimately denial of her victimization. The therapist made a clinical diagnosis of depression and concluded that Plaintiff was in denial, resulting from her mental inability to cope with the shame and guilt associated with the abuse. This was demonstrated by the facts that Plaintiff spent that Christmas with her parents and was unable to remember earlier disclosures of memories of abuse in subsequent therapy sessions.

¶ 5 As her therapy continued, however, Plaintiff began to recall additional specific incidents of especially brutal sexual abuse perpetrated by her father, including being forced to watch pornographic movies, digital penetration, penetration with objects, and cunnilingus. Plaintiff also recalled an extremely disturbing memory of "acting out" behavior that was symptomatic of her abuse—an attempt at bestiality. The record does not indicate when, subsequent to July 1989, Plaintiff remembered specific incidents.

¶ 6 So devastating were the abusive events that Plaintiff's depression and suicidal ideation became more severe during the course of therapy. Consequently, she was referred to a psychiatrist who, among other things, prescribed anti-depressants. In June 1990, Plaintiff told her therapist graphic details of an especially heinous incident of sexual abuse. The following day, Plaintiff contacted her therapist to disclose that she had a .38 caliber pistol and was feeling dangerously suicidal. Plaintiff's therapist persuaded her to admit herself to a hospital for treatment, although Plaintiff initially failed to comprehend that she was being admitted to the psychiatric ward. In the hospital, Plaintiff was again incapable of discussing her memories of sexual abuse with her psychiatrist. Against medical advice, Plaintiff left the hospital. At this point, Plaintiff still remembered only a fraction of the seven-year series of sexually abusive events.

¶ 7 After leaving the hospital, Plaintiff traveled to her parents' residence in Phoenix and confronted them with general accusations of sexual abuse. Her mother did not question the truth of the allegations but only apologized for having allowed the abuse to happen. When Plaintiff confronted her father, he said he had been expecting her accusations, admitted his behavior was inappropriate, and apologized. Few specific details of the abuse were discussed. Nonetheless, this conversation with her parents, albeit versed in the most general terms, was the first time Plaintiff was able to discuss her memories of sexual abuse with anyone other than her therapist.

¶ 8 Plaintiff returned to New York to continue her therapy and attempted to resume her position as vice president for NASDAQ trading at a large and prestigious brokerage firm. Memories of sexual abuse continued to surface, rendering Plaintiff incapable of performing her duties. In September 1990, she left her job and moved to Seattle where she continued treatment. The vast majority of her memories of sexual abuse were recovered while she was in Seattle. The impact of the surfacing memories incapacitated Plaintiff emotionally, to the extent that she could not even attempt

to seek employment. The continuing recollections of sexual abuse adversely affected Plaintiff in other ways as well. For instance, her depression continued, and she required medications to enable her to sleep, mitigate depression, and relieve her irritable bowel syndrome. During this period, however, Plaintiff was finally able to disclose facts about her abuse to persons other than her therapists and abusers, as evidenced by her discussing the ordeal with close friends. Some time before June 1991, Plaintiff contacted an attorney to ascertain the limitations period with respect to her damages claim.

¶9 In November 1991, Plaintiff asked her parents to participate in her therapy sessions. They refused, responding in a November 20 letter, "[We] cannot help you work all this out. We did the best job we could at the time, we know we made mistakes and we apologize, but that's all we can do.... I am certain you are having pain, as you say, in this process, but nothing can be accomplished by digging up the past." Plaintiff's parents did not deny the abuse at any time before this action was filed on May 13, 1992.

¶10 In her action, Plaintiff asserted claims against her father for the abuse and against her mother for negligence in failing to protect her. On motion for summary judgment, her father denied the abuse allegations, questioned the possibility of repressed memory of abuse, and argued "the court need not consider the legitimacy or the credibility" of Plaintiff's allegations because the statute of limitations had run. Applying the discovery rule, but holding that discovery occurred as of the date of the first flashback on July 10, 1989, the trial judge granted summary judgment in the parents' favor.

¶11 A divided court of appeals affirmed. *Doe v. Roe*, 187 Ariz. 605, 931 P.2d 1115 (App.1996). The majority rejected Plaintiff's claim that her parents were estopped from claiming the benefit of the statute of limitations because they caused her mental impairment. Citing *Ulibarri v. Gerstenberger*, 178 Ariz. 151, 871 P.2d 698 (App.1993), the court then said that in addition to abuse, Plaintiff had to show her parents committed some affirmative act of concealment or induced her to refrain from filing the action. 187 Ariz. at 608, 931 P.2d at 1118. The court held the discovery rule applied to claims of repressed memory, but the two-year statute of limitations began to run for all incidents of abuse from the date of the first memory, July 10, 1989, or at the latest within six months thereof, under an "investigate and discover standard." *Id.* at 609–10, 931 P.2d at 1119–20. Finally, the court held that under *Florez v. Sargeant*, 185 Ariz. 521, 917 P.2d 250 (1996), Plaintiff's claim for tolling the statute of limitations due to the disability of unsound mind failed because she was able to manage her daily affairs. 187 Ariz. at 608, 931 P.2d at 1118.

¶12 Dissenting, Judge Lankford argued that whether the discovery rule preserves these claims is a question of fact for the jury. Reasoning that each incident of abuse gives rise to a separate cause of action, the dissent also concluded that the statute of limitations on Plaintiff's claims against her father should run from the discovery of the separate incidents of abuse. The May 1992 complaint was timely, therefore, as to the incidents recalled on and after May 13, 1990. *Id.* at 614, 931 P.2d at 1124. As for the implication that Plaintiff did not exercise due diligence to investigate and discover the nature and extent of her injuries, Judge Lankford noted, "These efforts [through psychiatric counseling] were so traumatic that plaintiff became suicidal and required psychiatric hospitalization. How much more diligent could plaintiff have been than this?" *Id.* at 615, 931 P.2d at 1125.

## DISCUSSION

¶13 We granted review on the following issues: (1) whether summary judgment is precluded by genuine factual questions whether Plaintiff discovered or should have discovered her cause of action more than two years before she filed suit, and (2) whether the statute of limitations period was tolled by Plaintiff's mental impairment.

¶14 We must determine, therefore, how the discovery rule and the tolling provisions of the statute of limitations are to be applied

when a plaintiff alleges that her memories of severe childhood sexual abuse were repressed and not recalled until adulthood. The nature of repressed memory and the effects of childhood sexual abuse bear directly on the application of the law and its underlying policies. At this stage of the case, of course, we must take the facts in the light favoring the party against whom summary judgment was granted. *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992). Viewing the facts in this light, to apply the law pertaining to the statute of limitations we must first understand the theories Plaintiff advances. Thus, we note preliminarily that the parties presented this case to us on the assumption that the phenomenon of repressed memory exists, the theory is valid, and expert opinion admissible. While agreeing with that posture, Defendants stated at oral argument that in the event of remand, they have preserved the right to object to evidence of repressed memory on the ground that it does not conform to accepted scientific theory and is therefore inadmissible under the test of *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923).[1]

¶ 15 Given this situation, in reviewing the propriety of the trial judge's grant of summary judgment we have accepted the case as presented by the parties, and have assumed the phenomenon of repressed memory exists and the concept could be applied to Plaintiff's discovery and tolling claims. We have not addressed or decided the *Frye* issue—conformance to accepted scientific theory—or even considered whether the issue is preserved or whether the *Frye* test is applicable at all to evidence of this nature.

¶ 16 The following discussion of the literature describing the pros and cons of repressed memory theory, therefore, is made only to enable the reader to understand the mechanics of the alleged phenomenon and its application to claims of discovery and tolling, as well as to make clear that even if repressed memory is, in general, a valid theory, there is always the possibility of false or implanted memory, an issue that would normally be for the jury to decide.

## A. The repressed memory debate

¶ 17 The popular term "repressed memory" generally refers to a psychological condition whereby a victim of a traumatic event represses memory of the event in his or her subconscious. The nature and reliability of memories associated with traumatic events have been studied and debated for over a century. We present only the brief overview necessary for an understanding of how legal principles apply.

### 1. Mechanics of memory repression and recall

¶ 18 Memory repression, also referred to as selective amnesia, traumatic amnesia, and dissociative amnesia, has been documented in various contexts among persons who have survived severe trauma, including concentration camp survivors, combat veterans, and victims of childhood abuse.[2]

---

1. Evidently, the savings clause is in a footnote in Defendants' motion papers and reads as follows:

 [Defendant] denies that he molested his daughter at any time. He also disputes that Plaintiff could possibly have no memory of the alleged continued and systematic sexual assault which allegedly occurred during her teenage years until her mid-thirties. Such a position is inherently incredible. In any event, based on the facts presented by her own admissions and those of her therapist, because she actually "remembered" that these alleged events took place, suffered hysteria and extreme emotional distress as a result and immediately began therapy, the court need not consider the legitimacy or the credibility of her initial position in this motion for summary judgment.

2. Dissociative amnesia is the term recognized in the diagnostic manual of psychologists and psychiatrists, where it is described as a "disruption in the usually integrated functions of consciousness, memory, identity, or perception of the environment" and is "characterized by an inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by ordinary forgetfulness." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL FOR MENTAL DISORDERS § 300, at 477 (4th ed.1994). Other facets of the syndrome include a "reversible memory impairment in which memories of personal experience cannot be retrieved in a verbal form" and clinically significant distress or impairment in social, occupational, or other important areas of functioning caused by the symptoms. *Id.* § 300.12, at 478.

¶ 19 In laymen's terms, memory repression is the involuntary blocking of memory so that the memory remains stored but inaccessible to the conscious mind. Repression is a psychological defense mechanism that protects the individual from being confronted with the memory of an event that is too traumatic to cope with. A documented example is the woman known as the "Central Park Jogger," who was incapable of recalling the brutal attack and repeated rape she suffered just one year earlier. Alison Bass, *Researching Head Trauma and Amnesia: Brain Injury Usually Is the Cause But Often the Victim Represses the Painful Memories,* BOSTON GLOBE, July 9, 1990, at 27. Physiological research conducted on the functioning of memory demonstrates the brain's biological capacity to retain memories yet prevent conscious access to them. *See* Cynthia Grant Bowman & Elizabeth Mertz, *A Dangerous Direction: Legal Intervention in Sexual Abuse Survivor Therapy,* 109 HARV. L. REV. 549, 600–04 (1996). The memory is not lost but remains dormant and inaccessible. The individual functions with no conscious awareness of the traumatic event. Researchers and clinicians attest that the inaccessible memory may nonetheless adversely impact the individual's psychological well-being and is frequently manifested by substance abuse, severe depression, suicidal tendencies, and sexual and social dysfunctions. *See* Judith Herman & Emily Schatzow, *Recovery and Verification of Memories of Childhood Sexual Trauma,* 4 PSYCHOANALYTIC PSYCHOL. 1, 2 (1987).

¶ 20 Repressed memories are, however, only temporarily inaccessible. Research on the biology of memory verifies the brain's capacity to retrieve previously inaccessible memory in response to stimuli.[3] These stimuli, commonly referred to as triggers, include sensory experiences, therapy, and spontaneous recall. For instance, in *Hewczuk v. Sambor,* in a near-drowning incident in adulthood, the plaintiff experienced a feeling of having undergone a similar trauma earlier in life. Evidence later established that during childhood the plaintiff's foster parents nearly drowned her by submersing her head in a toilet. 1993 WL 45079 (E.D.Pa.1993).

¶ 21 In addition, the biological functioning of memory may leave persons who experience trauma incapable of synthesizing a narrative description of the event.[4] The po-

---

3. Bowman and Mertz summarize:

> Both short- and long-term memories take implicit as well as explicit forms. Explicit memory—the content of what we know and remember—generally involves the temporal lobes of the brain and, in particular, the hippocampus.... Implicit memory—storage of the largely unconscious perceptual and motor portions of experiences—is processed by different parts of the brain: the amygdala and the cerebellum.
>
> Explicit memory, which "corresponds to stored information that can be used in language, reasoning, and the production of novel behavior," is more accessible to conscious reflection and manipulation. Implicit memory, by contrast, tends to work in a more inflexible and reflexive manner, and is often triggered in a fairly automatic, unthinking fashion by external stimuli (a sight, sound or smell, for example, that is similar to one involved in the memory). This kind of stimulus-based triggering of sensory/motor experiential memory is consistent with the flashback experiences reported by trauma survivors.

Bowman & Mertz, *supra,* 109 HARV. L. REV. at 600–01 (citations omitted).

4. Dr. Bessel van der Kolk has extensively researched traumatic memory, particularly in the processes of encoding and retrieving memories, and summarized his findings as follows:

> Dissociation refers to a compartmentalization of experience: elements of the experience are not integrated into a unitary whole, but are stored in memory as isolated fragments consisting of sensory perceptions or affective states.... [W]hen people feel threatened, they experience a significant narrowing of consciousness, and remain merely focussed on the central perceptual details. As people are being traumatized, this narrowing of consciousness sometimes evolves into amnesia for parts of the event, or for the entire experience. Students of traumatized individuals have repeatedly noted that during conditions of high arousal "explicit memory" may fail. The individual is left in a state of "speechless terror" in which the person lacks words to describe what has happened. However, while traumatized individuals may be unable to give a coherent narrative of the incident, there may not be interference with implicit memory: they may "know" the emotional valence of a stimulus and be aware of associated perception, without being able to articulate the reasons for feeling or behaving in a particular way.
>
> * * *
>
> Such dissociative processing of traumatic experience complicates the capacity to communi-

tential for absence of a narrative is evidenced in one study that observed a child who had been sexually molested by a babysitter in the first two years of life. The child could not, at age four, remember the abuse, but in his play he exactly replicated the pornographic movie made by the babysitter. LEONORE TERR, TOO SCARED TO CRY: PSYCHIC TRAUMA IN CHILDHOOD 248–51 (1990).

¶ 22 In childhood sexual abuse cases, the process of memory repression and recall has been demonstrated through empirical research. One widely recognized prospective study documented occurrences of memory repression, memory recall impelled by triggering events, and the positive relationship between the severity of abuse and the probability of memory repression.[5] A follow-up study illustrated the accuracy of the subjects'

retrieved memories, despite self-doubt and uncertainty.[6] In fact, some preliminary studies suggest that retrieved memories that were formerly repressed are in fact *more accurate* than normal conscious memory.[7]

## 2. False memory syndrome

¶ 23 The concepts of repression and recovery of traumatic memories are not without serious criticism. "Clinical case studies have been rejected as unconfirmed speculations and a review of over sixty years of research failed to turn up a single controlled laboratory experiment to support the concept of repression.... [U]ntil experimental proof is available to demonstrate the existence of repression, experimental psychologists will remain skeptical." Gary M. Ernsdorff & Elizabeth F. Loftus, *Let Sleeping Memories*

cate about the trauma. In some people the memories of a trauma may have no verbal (explicit) component at all: the memory may be entirely organized on an implicit or perceptual level, without an accompanying narrative about what happened.
B. van der Kolk, & R. Fisler, *Dissociation and the Fragmentary Nature of Traumatic Memories: Overview and Exploratory Study*, 8 J. TRAUMATIC STRESS 505, 510–12 (1995) (citations omitted).

5. Linda Meyer Williams interviewed 129 women who had undergone treatment for childhood sexual abuse seventeen years earlier. Linda M. Williams, *Recall of Childhood Trauma: A Prospective Study of Women's Memories of Child Sexual Abuse*, 62 J. CONSULTING & CLINICAL PSYCHOLOGY 1167 (1994). She found that during their interviews thirty-eight percent of the women did not report the incidents of abuse that were documented seventeen years earlier, and in most cases the failure to report was attributable to the subjects' lack of memory. She also found that the closer the relationship between the perpetrator and the child, and the younger the child at the time of the abuse, the greater the likelihood that an incident would not be remembered. In these respects, Williams' findings add to studies that suggest that the probability of memory repression increases with the severity of sexual abuse. *See* Herman & Schatzow, *supra*, 4 PSYCHOANALYTIC PSYCHOL. at 5. Of those women in Williams' study who did remember the abuse, sixteen percent reported earlier repression. For these women, memories of abuse were not recalled through the process of therapy but from some triggering event.
 Other studies agree with Williams' conclusions. For instance, a study examining fifty-three women outpatients who participated in short-term therapy groups for incest survivors found that sixty-four percent did not have full

recall of the sexual abuse. Herman & Schatzow, *supra*, 4 PSYCHOANALYTIC PSYCHOL. at 1–14. Yet a full seventy-four percent of these patients were able to obtain confirmation of the abuse from another source. *Id.* In addition, clinicians who specialize in the treatment of adults who were sexually abused as children attest to the existence of the process of memory repression and recall. *See* Joy Lazo, Comment, *True or False: Expert Testimony on Repressed Memory*, 28 LOY. L.A. L. REV. 1345, 1375 (1995).

6. Williams reported in a follow-up study that the women often felt uncertain of their memories and said things such as, "What I remember is mostly a dream" or "I'm really not too sure about this." Williams pointed out: "These are statements which may arouse skepticism in individuals who hear the accounts of women who claim to have recovered memories of child sexual abuse (*e.g.*, therapists, judges, family members, researchers, the media). The findings from this study suggest that such skepticism should be tempered." Linda M. Williams, *Recovered Memories of Abuse in Women with Documented Child Sexual Victimization Histories*, 8 J. TRAUMATIC STRESS 649, 669–70 (1995).

7. Bowman and Mertz summarize the research:
 These bits and pieces of resurfacing implicit memory might even be stronger or more accurate than "normal" memory. Studies of war veterans have found more long-lived and vivid retention of physiological responses attached to traumatic memory. Some research also indicates that strong emotion can "retard the process of forgetting" at some levels, in a sense emblazoning certain central aspects of frightening or traumatic situations into the brain.
Bowman & Mertz, *supra*, HARV. L.REV. at 603 (citations omitted).

*Lie? Words of Caution About Tolling the Statute of Limitations,* 84 J.CRIM. L. & CRIMINOLOGY 129, 133 (1993). Other critics contend that no empirical evidence supports the theory of memory repression and retrieval. *See* Christina Bannon, Comment, *Recovered Memories of Childhood Sexual Abuse: Should the Courts Get Involved When Mental Health Professionals Disagree?,* 26 ARIZ. ST. L.J. 835, 845 (1994) (citing Miriam Horn, *Memories Lost and Found,* U.S. NEWS AND WORLD REPORT, (Nov. 29, 1993)).

¶ 24 The possibility of implanted false memories presents further concerns.[8] Experts in this field contend that therapists who are inadequately trained or lacking in integrity may suggest memories of abuse that never occurred. Intense scrutiny has been given to certain therapy techniques similar to hypnosis, such as guided imagery, that may lead to inaccurate or false memories. *See, e.g.,* Bannon, *supra,* 26 ARIZ. ST. L.J. at 843–45; *State v. Quattrocchi,* 681 A.2d 879, 881–82 (R.I.1996). The problem of false memories is particularly dangerous because the purported victim who remembers the suggested incident may honestly believe she is telling the truth. This could result in the conundrum of a witness who truthfully testifies that she remembers incidents that in fact never occurred.[9]

¶ 25 The possibility of false, implanted memories, however, does not negate the case made for the existence of repressed memory because memory retrieval often occurs in the absence of therapy or other forms of treatment. *See* Lazo, *supra,* 28 LOY. L.A. L. REV. at 1376–78.[10] One author has observed, "If such memories were induced only by pesky

therapists, survivors . . . would not spontaneously recover them outside therapy. But they do." David Chaloff, *Facing the Truth About False Memory,* FAM. THERAPY NETWORKER 39, 42 (Sept./Oct.1993) (*quoted in* Lazo, *supra,* 28 LOY. L.A. L. REV. at 1377). A statement by the American Psychological Association Working Group on the Investigation of Memories of Childhood Abuse summarizing the state of knowledge with regard to memory repression endorses the existence of memory repression in spite of the possibility of false implanted memories: "it's possible to create a false belief *and* it's possible to retrieve a lost memory." Bowman & Mertz, *supra,* 109 HARV. L. REV. at 598 (quoting Kim Ode, *Task Force Investigates Repressed Memory Issues,* STAR TRIB. (Minneapolis–St.Paul), Oct 11, 1993, at 3E (emphasis added)). Thus the psychological process of memory repression and recall is not discredited by the possibility that a false memory has been implanted. Rather, either of these processes may explain a particular factual allegation of therapy-induced memory recall.

¶ 26 From a review of the literature, we must conclude that repressed memories of childhood abuse can exist and can be triggered and recovered. We also conclude that such memories can be inaccurate, may be implanted, and may be attributable to poorly trained therapists or use of improper therapeutic techniques. On the record before us, it is impossible to say which is the case here. Suffice it to say at this stage of the proceedings—summary judgment—we must assume the truth of Plaintiff's submission and that it would be for the jury to decide the question

---

8. In one study, a trusted sibling told a college student a false story about having been lost in a shopping mall as a small child. While the subject at first did not believe or remember the story, he later adopted it as true and described it as if it were an actual memory. ELIZABETH LOFTUS & KATHERINE KETCHUM, THE MYTH OF MEMORY REPRESSION 95–96 (1994). For obvious ethical reasons, there have been no studies to verify whether it may be possible to implant false memories of traumas such as child molestation.

9. "To say that memory might be false does not mean the person is deliberately lying." Elizabeth F. Loftus, *The Reality of Repressed Memories,* AM. PSYCHOLOGIST 525 (May 1993). The phe-

nomenon of implantation of false memories has unsurprisingly led to lawsuits for third-party malpractice against therapists. *See, e.g.,* Sheila F. Rock, Note, *A Claim for Third Party Standing in Malpractice Cases Involving Repressed Memory Syndrome,* 37 WM. & MARY L. REV. 337 (1995).

10. Examples of memory retrieval outside therapy are numerous. *See e.g.,* Lazo, *supra,* 28 LOY. L.A. L. REV. at 1376–78 (collecting examples, *e.g., McAfee v. Cole,* 637 A.2d 463, 465 (Me.1994) ("plaintiff alleged he repressed all memories of sexual abuse until 'he saw a television report that [defendant] had been charged with sexually abusing other persons'").

of repressed memory recovery or false memory syndrome.

¶ 27 Thus we accept, as do the experts, the possibility that a victim of severe stress such as childhood sexual abuse might repress memory of the trauma and later experience recall of those events. Furthermore, we note that in this case the concerns about implantation of false memories are not at issue—Plaintiff's initial flashback occurred spontaneously rather than through suggestive therapy techniques. The task before us, then, is to discern how the limitations period and concomitant exceptions apply to the case of repressed memory.

¶ 28 Plaintiff was a minor when the alleged sexual abuse occurred. The two-year limitations period for her claim therefore did not begin to run until her eighteenth birthday. A.R.S. § 12–502. Plaintiff did not file her claim within two years from that date and advanced three grounds in support of her claim as timely filed: (1) her parents are estopped from asserting the statute of limitations, (2) her cause of action did not accrue under the discovery rule until within two years of her filing, and (3) the limitations period was tolled due to her unsound mind. Plaintiff did not raise the estoppel theory in her petition for review, and we mention it only because the court of appeals decided the issue adversely to Plaintiff. Because the issue is not properly before this court, we do not address the court's disposition. We turn instead to the application of the discovery rule.

**B. The statute of limitations and recovery of repressed memory: the discovery rule**

 ¶ 29 The purpose of the statute of limitations is to "protect defendants and courts from stale claims where plaintiffs have slept on their rights." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co.,* 182 Ariz. 586, 590, 898 P.2d 964, 968 (1995) (citing *Ritchie v. Grand Canyon Scenic Rides,* 165 Ariz. 460, 464, 799 P.2d 801, 805 (1990)). One does not sleep on his or her rights with

respect to an unknown cause of action. Thus, Arizona law recognizes that "one of the fundamental reasons underlying the philosophy of these statutes—the presumed invalidity of a claim allowed to become stale—is not present in the case where the injured plaintiff has no knowledge that such a claim exists." *Mayer v. Good Samaritan Hosp.,* 14 Ariz.App. 248, 251–52, 482 P.2d 497, 500–01 (1971). Under the discovery rule, therefore, a cause of action does not accrue until the plaintiff knows or with reasonable diligence should know the facts underlying the cause. *Gust,* 182 Ariz. at 588, 898 P.2d at 966. The rationale offered for the discovery rule "is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists." *Id.* at 589, 898 P.2d at 967.

 ¶ 30 The court of appeals held that the discovery rule delays the accrual of a cause of action based on childhood sexual abuse when the plaintiff retrieves repressed memories of the abuse. *Doe,* 187 Ariz. at 609, 931 P.2d at 1119. We agree. A victim whose memory is inaccessible lacks conscious awareness of the event and thus cannot know the facts giving rise to the cause. The policy behind the discovery rule is thus served by application to repressed memory cases involving childhood sexual abuse and is, we believe, logically appropriate given that the intentional act of the tortfeasor caused both the damage and the repression of memory. *See Hewczuk v. Sambor,* 803 F.Supp. 1063, 1065 (E.D.Pa.1992). To hold otherwise would be to effectively reward the perpetrator for the egregious nature of his conduct and the severity of the resulting emotional injury. To hold otherwise in Arizona would also fly in the face of legislative policy, which has imposed the most severe criminal penalties on perpetrators of childhood sexual abuse. *See, e.g.,* A.R.S. § 13–107(B) (discovery rule applicable to criminal prosecutions). Application of the discovery rule to tort sexual abuse cases is also, we believe, the majority rule in this country.[11]

---

11. *See Sellery v. Cressey,* 48 Cal.App.4th 538, 55 Cal.Rptr.2d 706 (1996); *Farris v. Compton,* 652 A.2d 49 (D.C.1994); *Dunlea v. Dappen,* 83 Ha-

wai'i 28, 924 P.2d 196 (1996); *Johnson v. Johnson,* 701 F.Supp. 1363 (N.D.Ill.1988); *Doe v. Cherwitz,* 518 N.W.2d 362 (Iowa 1994); *Doe v.*

¶ 31 While holding that the discovery rule applies in this case, the court of appeals affirmed summary judgment, in effect affirming the trial judge's factual finding of the moment at which Plaintiff retrieved sufficient memory to discover the facts underlying her cause of action. The court of appeals then held that all separate incidents of abuse suffered by Plaintiff, remembered or not, are imputed to Plaintiff's initial memory of *any* abuse—so that the totality of seven years of various forms of the most egregious types of sexual abuse are in effect aggregated as one cause of action, triggered by the earliest recovered memory of any incident. In reaching this result, the court rejected Plaintiff's argument that the statute of limitations was tolled because of Plaintiff's long and deep-seated mental disability attributable to the sexual abuse by her father.

### 1. When discovery occurs

¶ 32 When discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury. *Gust,* 182 Ariz. at 591, 898 P.2d at 969 (trial judge correct to let jury decide when discovery occurred). A plaintiff need not know *all* the facts underlying a cause of action to trigger accrual. *Richards v. Powercraft Homes, Inc.,* 139 Ariz. 264, 266, 678 P.2d 449, 451 (App.1983), *vacated in part,* 139 Ariz. 242, 678 P.2d 427 (1984). But the plaintiff must at least possess a minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury. *See, e.g., Lawhon v. L.B.J. Institutional Supply, Inc.,* 159 Ariz. 179, 183, 765 P.2d 1003, 1007 (App. 1988) (cause of action accrues when plaintiff discovers injury is attributable to particular person's conduct; plaintiff must know both the what and who elements). In his motion for summary judgment, Plaintiff's father argued that Plaintiff possessed sufficient knowledge of facts for her cause of action to

accrue under the discovery rule when she had her first flashback of abuse, pointing to statements that on July 10, 1989, Plaintiff remembered she had been molested by her father, she began therapy, and she was aware that incidents of abuse caused some injury. Had the argument gone unanswered or unexplained, we would agree that summary judgment was warranted.

¶ 33 Upon a moving party's prima facie showing that no genuine issue of material fact exists, the opposing party bears the burden of producing sufficient evidence that an issue of fact does exist. *W.J. Kroeger Co. v. Travelers Indemn. Co.,* 112 Ariz. 285, 286, 541 P.2d 385, 386 (1975). In opposition to the father's motion, Plaintiff produced such evidence, offering therapist's affidavits and her own statements maintaining she could not accept the truth of the recovered memories, did not believe them, and was in denial that the abuse occurred. There was uncontradicted evidence Plaintiff spent the 1989 Christmas holidays with her parents and never mentioned her flashbacks of abuse. This evidence, of course, raises conflicting inferences—she was in denial and so spent the holidays with her parents, or she remembered but resolved to put the matter behind her. In reviewing the grant of summary judgment, we are compelled by law to accept the first interpretation. Moreover, Plaintiff asserted she did not disclose her memories of abuse to anyone other than her therapist until June 1990, thus supporting the concept of denial or inability to remember while actually trying to remember what had happened. A therapist's affidavit averred that Plaintiff was very committed to her recovery, she was hospitalized and had to forego employment due to her emotional state, and she did not recall the vast majority of incidents of abuse until after May 1990.

*Roman Catholic Church,* 656 So.2d 5 (La.App.), *cert. denied,* 662 So.2d 478 (La.1995); *Nuccio v. Nuccio,* 673 A.2d 1331 (Me.1996); *Phinney v. Morgan,* 39 Mass.App.Ct. 202, 654 N.E.2d 77, *rev. denied,* 421 Mass. 1104, 656 N.E.2d 1258 (1995); *Sheehan v. Sheehan,* 901 S.W.2d 57 (Mo. 1995); *Petersen v. Bruen,* 106 Nev. 271, 792 P.2d 18 (1990); *McCollum v. D'Arcy,* 138 N.H. 285, 638 A.2d 797 (1994); *Jones v. Jones,* 242 N.J.Super. 195, 576 A.2d 316 (N.J.Super.A.D.), *cert. denied,* 122 N.J. 418, 585 A.2d 412 (1990); *Peterson v. Huso,* 552 N.W.2d 83 (N.D.1996); *Ault v. Jasko,* 70 Ohio St.3d 114, 637 N.E.2d 870 (1994); *Lovelace v. Keohane,* 831 P.2d 624 (Okla.1992); *Olsen v. Hooley,* 865 P.2d 1345 (Utah 1993); *Hammer v. Hammer,* 142 Wis.2d 257, 418 N.W.2d 23 (Wis.App.1987), *rev. denied,* 144 Wis.2d 953, 428 N.W.2d 552 (1988).

¶ 34 On motion for summary judgment, reasonable inferences are to be viewed in the light most favorable to the non-moving party. *Webster v. Culbertson*, 158 Ariz. 159, 160, 761 P.2d 1063, 1064 (1988). Applying this rule, the trial judge should have determined that an issue of fact existed whether Plaintiff knew or had discovered the facts underlying her claim on July 10, 1989. In the present posture of the case, a jury could infer that Plaintiff: did not believe the accuracy of her flashbacks until some time in 1990; did not recover a sufficient quantum of memories to establish a claim until the majority of her memories surfaced after May 1990; and was diligent in seeking the facts underlying her claim but, given her mental state, the majority of facts were undiscoverable until after May 1990. The affidavits and supporting documents as a whole, then, raised genuine issues of material fact whether Plaintiff discovered the facts underlying her claim on July 10, 1989, or by June 1990, when she finally traveled to her parents' home and confronted them, or some time in between. The latter date, of course, would place the filing of this action within the two-year limitations period.

¶ 35 The court of appeals reasoned that because Plaintiff realized on July 10, 1989 she had been sexually abused by her father and began to discuss the abuse six months thereafter, Plaintiff knew or with reasonable diligence should have known that her father harmed her. The intricate mechanics of recalling repressed memories, however, do not permit so easy an analysis. As noted, victims of sexual abuse may experience recall of repressed memories in a piecemeal fashion and over long periods of time. Taken separately, these memory fragments may not provide a comprehensible depiction of any past incident. Moreover, for some time a victim may deny that the incidents actually took place, as Plaintiff did. The court of appeals essentially charged Plaintiff with a duty to file a complaint based on information she subjectively believed to be false or unbelievable at the time. Many if not most people would tend to reject the validity of memories of such heinous events. The discovery rule does not require a person to file a complaint based on knowledge the person believes is false.

¶ 36 The jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action. We take as instructive the Utah Supreme Court's remand instructions in *Olsen v. Hooley*, 865 P.2d 1345 (Utah 1993). After determining the discovery rule applied in cases involving repressed memory the court stated: "If the fact finder finds for [plaintiff] on [this] issue, it must then ascertain at what point [she] recalled the abuse. It is at that point the limitations period began to run." *Id.* at 1350; *see also Osland v. Osland*, 442 N.W.2d 907, 909 (N.D.1989); *Hammer v. Hammer*, 142 Wis.2d 257, 418 N.W.2d 23, 27 (Wis.App.1987). Plaintiff here presented evidence that she did not recall the vast majority of incidents of abuse until well after May 1990. Thus there was a significant gap in the "what" component of her knowledge. On this record it is not clear when Plaintiff remembered what; thus determining the time when the quantum of knowledge was sufficient is a task reserved exclusively to the jury.

**2. Duty to investigate**

57 37 There is, of course, another component to determine in applying the discovery rule. Plaintiff may not have been aware of all the facts but is charged with a duty to investigate with due diligence to discover the necessary facts. On this point, too, we believe Judge Lankford's dissent is correct in arguing that the reasonable diligence component of the discovery rule does not impose a rigid investigate and discover standard that ignores the psychology of repressed memory. *Doe*, 187 Ariz. at 615, 931 P.2d at 1125 (Lankford, J., dissenting). To impose such a standard to memories that may be physiologically inaccessible to the conscious mind is antithetical to the policy behind the discovery rule. *See Gust*, 182 Ariz. at 589, 898 P.2d at 966 (it is unjust to deprive plaintiff of cause of action before plaintiff has reasonable basis for believing claim exists). The dissent is also correct in asserting that if an investigate and discover

standard existed, Plaintiff's actions here at least presented a question for the jury. *Doe,* 187 Ariz. at 615, 931 P.2d at 1125 (Lankford, J. dissenting). Plaintiff's affidavit stated that she sought counseling and therapy *immediately* upon experiencing her first flashback. Her therapy sessions increased to twice a week. In June 1990, Plaintiff recalled an incident so disturbing that she became suicidal, was admitted into a psychiatric unit, and was prescribed antidepressants. In September of that year, Plaintiff's memory recovery became so overwhelming she could no longer perform her duties as a stock trader and consequently left her position. On these facts, it is not possible to say as a matter of law that Plaintiff failed to act with reasonable diligence in seeking an answer to the dark question forced upon her by her initial flashback in July 1989: was she in fact the victim of sexual abuse?

## C. Does a series of incidents of sexual abuse constitute one tort or separate torts

¶ 38 The court of appeals treated the aggregate of incidents of abuse as one tort, while the dissent maintained that each incident of abuse constituted a separate tort and concluded that "the fact that plaintiff recalled one incident does not mean that she recalled—or that she should have recalled—others." *Doe,* 187 Ariz. at 614, 931 P.2d at 1124 (Lankford, J., dissenting). The majority rejected this position, reasoning that treating each incident of abuse as a separate tort for discovery rule purposes could result in a multiplicity of actions with additional retrieval of memories. Thus, the majority imputed recollection of all repressed memories to the moment Plaintiff had her first flashback, in effect viewing the separate episodes of abuse as a single continuing tort.

¶ 39 The question of whether the separate tort, separate action theory was correctly rejected by the court of appeals' majority was neither presented nor accepted for review. Nor was it a major issue in the trial court. This case can be resolved at this stage without dealing with the difficult problem of applying an accrual rule—constructed for the usual case, in which a single act causes a single set of damages—to the instant case, in which repeated tortious acts inflicted over a period of years have caused a universe of damage that cannot be allocated to any particular act.[12] Given this, we believe it best to follow our usual jurisprudential policy and refuse to address questions of the application of the statute of limitations on a separate tort or continuous tort theory.

## D. Statutory provisions for tolling—unsound mind

¶ 40 The limitations period begins to run upon accrual. However, the Arizona Legislature has enumerated three conditions that toll the running of the statute of limitations—minority, unsound mind, and imprisonment. So far as relevant, A.R.S. § 12–502 states:

> If a person entitled to bring an action ... is at the time the cause of action accrues ... of unsound mind, the period of such disability shall not be deemed a portion of the period limited for commencement of the action. Such person shall have the same time after removal of the disability which is allowed to others.

¶ 41 The statutory provision for tolling based on unsound mind is premised on equitable principles similar to those that underlie the discovery rule: it is unfair to bar an action in which the plaintiff is mentally disabled and thus unable to appreciate *or pursue* his or her legal rights. *See, e.g.,*

---

12. *But see* the 1906 case of *Henshaw v. Salt River Valley Canal Co.,* in which our territorial court posed the following interesting hypothetical:

 If my neighbor, playing tennis, pursues a stray tennis ball upon my lawn, breaking and damaging my hedge and beds of flowers, I have a cause of action for the damage, instantly accruing, which after the lapse of a period is barred by statute. Suppose my neighbor persists in his tennis playing and in frequent trespasses in pursuit of stray balls for years beyond the period of limitation. When my patience is finally exhausted, am I prevented from recovering damages for those acts of trespass within the statutory period, or from obtaining an injunction to prevent future trespass, for no other reason than that I have tolerated [some of] the acts for years beyond the period of statutory limitation? Such is neither the purpose nor the effect of the statutes of limitation.

 9 Ariz. 418, 421, 84 P. 908, 909–10 (1906).

*Vega v. Morris,* 184 Ariz. 461, 463–64, 910 P.2d 6, 8–9 (1996);[13] *O'Neal v. Division of Family Services,* 821 P.2d 1139, 1142 (Utah 1991) ("Tolling statutes based on mental incompetency are enacted to relieve from the strict time restrictions people 'who are unable to protect their legal rights because of an overall inability to function in society.' ").[14] While the purpose of the discovery rule and the tolling provisions for unsound mind are essentially similar, their applications are critically distinct. The discovery rule contains an informational component requiring that the factfinder determine when the plaintiff knew or should have known the facts that constitute a cause of action. Tolling for unsound mind, on the other hand, requires that the factfinder determine whether the plaintiff had the mental capacity to bring a claim based on those facts. Thus, taken together, the discovery rule and the tolling provision for unsound mind delay the running of the statute of limitations requiring that the plaintiff both know of the underlying facts and be mentally capable of bringing a claim.

¶ 42 In Arizona, unsound mind occurs when the "person is unable to manage his affairs or to understand his legal rights or liabilities." *Allen v. Powell's Int'l, Inc.,* 21 Ariz.App. 269, 270, 518 P.2d 588, 589 (1974). This standard recognizes two separate inquiries that may evince an unsound mind: (1) inability to manage daily affairs, and (2) inability to understand legal rights and liabilities. The resulting inability to bring the action is a basis for tolling the statute of limitations under unsound mind. *Porter v. Charter Medical Corp.,* 957 F.Supp. 1427,

1437 (N.D.Tex.1997) (purpose of unsound mind tolling is to protect persons who are without access to courts and unable to participate in, control, or understand progression of suit);[15] *O'Neal,* 821 P.2d at 1142. We recently held, however, that it is insufficient to summarily claim "inability to bring the action." *Florez,* 185 Ariz. at 526, 917 P.2d at 255. The policy of protecting defendants against stale and fraudulent claims cannot be overcome by conclusory averments such as assertions that one was unable to manage daily affairs or understand legal rights and liabilities. *Id.* The plaintiff instead must set forth specific facts—hard evidence—supporting the conclusion of unsound mind. *Id.* But *Florez* recognized that recollection of repressed memories of such awful acts may itself constitute a traumatic experience. *Id.* at 526, 917 P.2d at 255. Thus, one who recalls such repressed memories may not be able to connect the images in a fashion sufficiently coherent to allow an understanding of the incident or the resulting injury. Such a person may not be able to articulate events so as to pursue her legal rights. These factors, standing alone, do not establish unsound mind but certainly bear upon the ultimate standard adopted in *Florez*—"whether a person is incapable of carrying on the day-to-day affairs of human existence." *Id.*

### 1. Daily affairs and unsound mind

¶ 43 While *Florez* raised the argument of repressed memory, our decision did not address memory repression but only the question of tolling because of unsound mind. *Id.* at 528, 917 P.2d at 257. A majority of this court found that the plaintiffs failed to as-

---

13. In *Vega,* we recognized that one of the underlying purposes for disability statutes was that such individuals "may not have a fair opportunity to establish the validity of their allegations...." Thus, in the situation of imprisonment, "it is not the prisoner's awareness of the facts surrounding the conduct or injury that ends the disability but, rather, awareness of the legal right or capacity to assert an enforceable claim." 184 Ariz. at 463–64, 910 P.2d at 8–9 (citations omitted).

14. Note that cases cited in *Florez* support the proposition that the effects of repressed memory would support a claim for unsound mind. In *Doe v. Coffee County Board of Education,* 852 S.W.2d 899, 905–06 (Tenn.App.1992), the court

indicated that repression of memory of abuse would comprise unsound mind for the tolling of the limitations period. In *Hildebrand v. Hildebrand,* 736 F.Supp. 1512, 1524 (S.D.Ind.1990), the court held that while the discovery rule was not applicable under Indiana law, the limitations period for plaintiff's physical and sexual abuse claims could be tolled nonetheless under the doctrine of fraudulent concealment. Likewise, in *O'Neal,* 821 P.2d at 1143–45, the court indicated that repression of memory might toll the statute of limitations under the discovery rule.

15. Note that the Arizona tolling statutes were adopted from similar Texas statutes. *See* Historical Notes to A.R.S. §§ 12–501 to 12–510.

sert sufficient facts to withstand summary judgment and that the facts presented in the record actually supported the opposite proposition. In *Florez,* the plaintiffs were able to maintain employment, take care of financial affairs (Gomez), attend school part-time and work full-time (Moonshadow), manage all their daily affairs, and take care of themselves. Gomez knew what had happened, and was able to talk about it and deal with it. He had consulted a lawyer and had been investigating the statute of limitations issue. *Id.* at 526, 917 P.2d at 255. The majority rejected as conclusory the only assertions in the affidavits that supported tolling—the experts' allegations that the plaintiffs suffered from unsound mind or post-traumatic stress disorder. The majority reasoned that "simply attaching the post-traumatic stress disorder label to a person's symptoms is insufficient to satisfy the *Allen* definition of unsound mind." *Id.* at 525–26, 917 P.2d at 254–55.

¶ 44 In the present case, the court of appeals has misread *Florez* for the harsh proposition that as a matter of law "the disabling psychological effects of child abuse do not constitute an 'unsound mind' under section 12–502(A) where the victims were able to function on a day-to-day basis and manage their ordinary affairs." *Doe,* 187 Ariz. at 608, 931 P.2d at 1118. The court of appeals then listed evidence presented in the affidavits demonstrating Plaintiff's ability to manage her daily affairs as grounds for granting summary judgment. But *Florez* does not stand for the proposition that summary judgment is appropriate just because there is evidence that an alleged victim is able to manage any of her daily affairs. That reading of *Florez* improperly shifts the focus of inquiry from whether the plaintiff has submitted evidence of her *inability* to manage her affairs to whether she has disproven her *ability* to manage any of them. A motion for summary judgment is decided on the basis of whether a genuine issue of material fact exists. In the context of determining unsound mind as evidenced by an inability to manage daily affairs, the question is whether there is *credible evidence* of the plaintiff's *inability* to manage daily affairs. The plaintiff is not required to discredit all

evidence of ability to manage her affairs—such controverting evidence merely establishes that there is a jury question on an issue of material fact.

¶ 45 Thus, the court of appeals' interpretation of *Florez* gives the court the inappropriate role of factfinder. It is not the court's role to weigh conflicting evidence to determine whether the plaintiff was capable of functioning on a day-to-day basis. That role would encroach upon the jury's function. *Florez* goes no further than to require factual rather than conclusory substantiation of unsound mind. The *Florez* discussion of facts demonstrating the plaintiffs' ability to manage their daily affairs was illustrative, but the critical inquiry of the majority opinion focused on the *absence of facts* supporting the plaintiffs' claim. When the plaintiff has alleged *facts* indicating inability to manage daily affairs, it is the court's duty to deny summary judgment. We do not permit the court to substitute itself for the factfinder.

¶ 46 Applying this to the present case, we conclude that the trial judge erred in granting summary judgment for Defendants. The record contains evidence from which one could conclude that for a considerable period of time Plaintiff was unable to function in day-to-day affairs. She experienced suicidal ideation, was in denial of the abuse she suffered, and required psychological and psychiatric therapy and treatment as well as institutionalization for her mental condition; because she was unable to function at work, she had to quit her job and was unable to seek other employment. Because of her denial and inability to articulate or discuss the abusive acts, a jury could find that Plaintiff, unlike the *Florez* plaintiffs, was disabled and thus unable to seek or address the issues with legal counsel for approximately two years. Also, unlike the *Florez* plaintiffs, Plaintiff was not ready to talk about it; nor was she ready to deal with it. *Cf. Florez,* 185 Ariz. at 526, 917 P.2d at 255. Unlike the affidavit in *Florez,* the affidavits in this case present facts, not mere conclusory opinions of post-traumatic stress disorder or unsound mind.

¶ 47 As the court of appeals correctly recognized, there are facts in the record that detract from Plaintiff's claim of inability to manage daily affairs; those findings would preclude summary judgment *in favor of Plaintiff if she moved for summary judgment on the unsound mind issue.* In that case, the issue would be whether there were any facts indicating Plaintiff was of *sound mind,* thus precluding summary judgment. However, it was Defendant who moved for summary judgment; the facts offered in opposition to that motion are more than sufficient to raise a genuine issue of material fact on whether Plaintiff was unable to carry on the day-to-day affairs of life.

### 2. Inability to understand legal rights and unsound mind

¶ 48 In the present case, the court of appeals limited its focus to whether Plaintiff was able to manage her daily affairs and ignored any relevance of the alternative inquiry into her ability to pursue the action— the second part of the *Allen* test. The separate concurrence today takes a similar view. Facts permitting, however, Plaintiff is entitled to have the jury consider both alternatives. The court of appeals erred to the extent that it read *Florez* as prohibiting any inquiry into the question of ability to pursue a legal action. In *Florez,* a majority of this court wrote, "[t]he focus of the unsound mind inquiry is on a plaintiff's ability to manage his or her daily affairs. It does not focus on plaintiff's ability to pursue the subject matter of the litigation at issue." 185 Ariz. at 525, 917 P.2d at 254. It appears that difficulty in interpreting this language may have given rise to a split in and between the two divisions of the court of appeals with respect to the proper scope of the *Allen* inquiry as applied in *Florez.* In *Nolde v. Frankie,* Division One interpreted *Florez* in the same manner as the *Doe* court. 190 Ariz. 422, 949 P.2d 511 (App.1997). The majority opinion reasoned that "the touchstone of whether an unsound mind will toll the statute is whether the plaintiff is able to manage his or her daily affairs." *Id.* at 423, 949 P.2d at 512. However, in *Logerquist v. Danforth,* Division

Two recognized that *Florez* held in favor of defendants "[b]ecause the evidence, demonstrated that both plaintiffs could function on a day to day basis *and* understood the nature of their legal rights." 188 Ariz. 16, 19, 932 P.2d 281, 284 (App.1996) (emphasis added).

¶ 49 *Florez* merely reaffirmed our long-standing two-part test of unsound mind. In our discussion, we cited favorably both divisions of the court of appeals: *Allen,* 21 Ariz. App. 269, 518 P.2d 588; and *Nelson v. Nelson,* 137 Ariz. 213, 669 P.2d 990 (App.1983). In *Allen,* of course, unsound mind was defined as being "unable to manage his affairs or to understand his legal rights or liabilities." 21 Ariz.App. at 270, 518 P.2d at 589. In *Nelson,* the court of appeals not only applied the *Allen* test but also provided some insight into the longevity of this standard in Arizona jurisprudence. The court cited as analogous a very early decision by this court in which incompetency, for purposes of invalidating a testamentary instrument, required that the grantor be "incapable of understanding in a reasonable degree and knowing the consequences of the instrument he executes." 137 Ariz. at 216, 669 P.2d at 993 (citing *Pass v. Stephens,* 22 Ariz. 461, 470, 198 P. 712, 715 (1921)). After relying on both opinions, we expressly agreed "with both divisions of our court of appeals." *Florez,* 185 Ariz. at 525, 917 P.2d at 254.

¶ 50 Moreover, the authorities cited in *Florez.* for the definition of unsound mind support the proposition that unsound mind is evaluated by both management of daily affairs *and* ability to comprehend legal rights. *See id.* In *O'Neal,* for example, the Utah Supreme Court explained that in "determining what sort of lack of ability and capacity to protect one's legal rights qualifies for disability protection, courts generally hold that a person is incompetent for the purposes of a provision tolling the statute of limitations 'when the disability is of such a nature to show him [or her] unable to manage his [or her] business affairs or estate, *or to comprehend his [or her] legal rights or liabilities.*'" 821 P.2d at 1142 (quoting 51 AM.JUR.2D *Limitation of Actions* § 187 (1970) (emphasis added)).[16]

---

16. The court went on to note that in past con-

structions of the probate code, the focus had

¶ 51 The language in *Florez* must be read *with respect to the facts of that case.* In *Florez*, almost all of the plaintiffs' evidence addressed only the first *Allen* factor of unsound mind—management of daily affairs. Nonetheless, the *Florez* majority considered the alternative *Allen* factor of ability to understand legal rights, noting that the only real evidence offered showed that the plaintiffs had discussed their potential causes of action with attorneys more than two years before bringing suit. 185 Ariz. at 526, 917 P.2d at 255. The court emphasized that one of the therapists admitted that Moonshadow "understood the nature of her legal rights." *Id.* Thus the only evidence considered by the majority supported the proposition that the plaintiffs *were able* to understand their rights. The brevity of attention paid to the second *Allen* factor was thus merely an incident to the factual case presented—not an abandonment of the factor. Indeed, consideration of the plaintiffs' retention of counsel was perfectly consistent with *Allen*, in which the only *factual* evidence bearing on the plaintiff's ability to understand his legal rights was the fact that he retained counsel. The *Allen* court concluded that the "fact that [the plaintiff] hired a lawyer within four months after the accident is strong evidence that the plaintiff was aware of his legal rights." 21 Ariz.App. at 270, 518 P.2d at 589. Thus *Florez* did not overrule *Allen* and should not be read as a departure from it.

■ ¶ 52 When the facts require the court to focus on the second part of the *Allen* test, inability to understand and assert legal rights may provide the basis for concluding that the plaintiff was of unsound mind. In the instant case, there is more than enough evidence to withstand summary judgment on the issue of whether Plaintiff was able to understand her legal rights. Depending on when Plaintiff's causes of action accrued, the following evidence may establish a genuine issue of material fact as to tolling: Plaintiff repressed memories of abuse (one cannot understand legal rights with respect to a wrong of which the person was unaware); she was in denial that any abuse took place, was unable to accept that the events had occurred, and was unable to articulate them; she experienced feelings of complicity with her abuser (evidencing, perhaps, that she did not understand that a wrong had occurred); and she experienced feelings of responsibility and guilt for the abuse (same). When she was able to confront her parents about the prior abuse, she was within the two-year limitations period. Moreover, in the present case consultation with an attorney, *the* single factor evidencing *an ability to understand* legal rights in both *Allen* and *Florez,* occurred within two years of the filing date. Thus the court of appeals erred in affirming the trial judge's award of summary judgment. The facts here create a genuine issue on the second *Allen* test—ability to understand and assert one's legal rights.

### 3. The discovery rule, the tolling rule, and timing

■ ¶ 53 The statute is tolled if the plaintiff is of unsound mind at the time the cause of action accrues or thereafter. A.R.S. § 12–502. In applying the tolling statute, however, the court of appeals considered

been on "a person's ability to care for his or her personal safety and provide basic human needs such as food, shelter, and clothing." 821 P.2d at 1142. The court proceeded to determine, under the pertinent facts of the case, that the plaintiff was in fact competent based on these daily affairs type factors—quite similar to the analysis in *Florez.* The court, however, did not abandon the ability to understand legal rights factors, as evidenced in *Olsen,* in which the court stated that *O'Neal* "held that a plaintiff is mentally incompetent ... when the mental disability is such that the plaintiff cannot mange his or her business affairs or estate or comprehend his or her legal rights or liabilities." 865 P.2d at 1347.

*Florez* also cited *Coffee County Board,* 852 S.W.2d at 904–05, and *Hildebrand,* 736 F.Supp.

1512. 185 Ariz. at 525, 917 P.2d at 254. These cases likewise do not support abandonment of the ability to understand legal rights factor. In *Coffee County Board,* the court indicated that the definition of unsound mind in Tennessee had focused on the plaintiff's incapacity to attend to business since 1842. 852 S.W.2d at 904–05. Likewise, in *Hildebrand,* the court explained that the Indiana definition of unsound mind had always been one of "idiots, noncompotes (non compos mentis), lunatics and distracted persons." 736 F.Supp. at 1524. Both cases were merely applying the longstanding tests for unsound mind in their respective jurisdictions, not limiting their unsound mind definitions.

facts that chronologically preceded by years Plaintiff's first memory of abuse. *Doe,* 187 Ariz. at 608, 931 P.2d at 1118. The court noted that "Doe was able to manage her affairs and understand her legal rights. She graduated from college, supported herself, worked as a stock trader, and was promoted to a vice president position." *Id.* These undisputed facts preceded any recalled events and consequent accrual of Plaintiff's cause of action under the discovery rule. They are therefore not determinative of whether the claim that came into existence after recall may be tolled due to an unsound mind.[17] The statute commands that tolling occur only if the plaintiff is of unsound mind at some time after the cause of action accrues. A.R.S. § 12–502. Plaintiff may have suffered throughout her life from denial, guilt, repression of memory, and some degree of incapacitation associated with the childhood sexual abuse, but under the discovery rule her cause of action did not accrue until some time after she had her first flashback. Thus the proper factual inquiry for whether Plaintiff was of unsound mind focuses on her mental condition at and after the time of accrual. The fact that Plaintiff demonstrated characteristics evincing a sound mind long prior to accrual does not by itself determine that Plaintiff's mind was sound upon or after accrual. Therefore, in conjunction with the discovery rule, it is for the jury to (1) discern when the cause of action accrued, and (2) determine whether at that time and thereafter Plaintiff was of unsound mind.

### E. Reconciliation of cases—policy of this court's statute of limitations jurisprudence

¶ 54 One can find support for almost any position by reading the numerous statute of limitations cases decided by this court and the court of appeals. Different facts often lead to different results, depending on which facts are considered to be important or determinative. A reasonable degree of rationality and consistency can best be achieved, we believe, if our courts advert to the policy that should inform each decision. We recently described that policy in a contract case dealing with the discovery rule:

> The rationale behind the discovery rule is that it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists. This reasoning is perfectly consistent with the kinds of cases to which this and other courts have applied the rule: "A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance."

> \* \* \*

> In our view, the important inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect, not whether the action sounds in contract or in tort. ... The defense of statute of limitations is never favored by the courts, and if there is doubt as to which of two limitations periods should apply, courts generally apply the longer.

> \* \* \*

However, whether a tort victim or a contract claimant, a blamelessly uninformed plaintiff cannot be said to have slept on his rights.

Furthermore, the problems associated with stale litigation (e.g., failing memory, unavailable witnesses) are no more acute

---

17. The court of appeals in *Logerquist* committed an identical error. It considered the plaintiff's ability to pursue an education and maintain employment, actions that apparently occurred prior to the time of recall, as determining the unsound mind issue. 188 Ariz. at 19, 932 P.2d at 284.

in contract claims than they are in tort. And in either case, the requirement that parties exercise reasonable diligence safeguards against cases where a plaintiff has truly allowed his claim to become stale. *Gust,* 182 Ariz. at 589–91, 898 P.2d at 966–69 (emphasis added) (citations omitted).

## CONCLUSION

¶ 55 The court of appeals erred in affirming the trial judge's finding that there was no genuine issue of material fact concerning Plaintiff's claim of unsound mind. The court erred as well in fixing the date on which Plaintiff discovered her claims. Implicit within these errors was a weighing of facts upon which reasonable persons might disagree. In this case involving a claim of repressed memory, we hold that the issues of accrual of a cause of action under the discovery rule and tolling for unsound mind are questions of fact for the jury. We therefore vacate the court of appeals' opinion, reverse the trial court's judgment, and remand to the trial court for further proceedings consistent with this opinion.

ZLAKET, C.J., JONES, V.C.J., and MOELLER, J. (Retired), concur.

MARTONE, Justice, concurring in the judgment.

¶ 56 Because there are genuine issues of fact as to when Doe discovered her cause of action, and whether the statute of limitations was tolled because she was of unsound mind, I join the court in concluding that summary judgment was inappropriate in this case. I thus join in the court's judgment. Because the court's opinion, however, goes quite beyond what is necessary to decide the case, and because it reflects a revised view of *Florez v. Sargeant,* 185 Ariz. 521, 917 P.2d 250 (1996) (Feldman, C.J., dissenting), I cannot join the court's opinion.

### I. The *Frye* Issue

¶ 57 As the court notes, the defendants were willing to assume for the purposes of their motion for summary judgment that the theory of repressed memory is legitimate. *Ante,* at ¶ 15. In light of this concession, this case affords us no opportunity to discuss the validity or invalidity of repressed memory. We should take this as a given and move on to see whether there are factual disputes. The parties, of course, have not briefed the issue and thus anything we say about it would be dicta indeed.

¶ 58 The court further notes that it neither addresses nor decides the *Frye* issue, *ante,* at ¶ 15, but nevertheless discusses selected fragments of some of the literature, *ante,* at ¶¶ 18–27, and actually announces its view on the scientific debate as though the issue were before us. *Ante,* at ¶ 26.

¶ 59 In my view, we should not indulge in substantive scientific inquiry, even in cases in which the *Frye* issue is squarely presented. *State v. Hummert,* 188 Ariz. 119, 127–28, 933 P.2d 1187, 1195–96 (1997) (Martone, J., concurring). But it is all the more inappropriate to discuss the legitimacy of a scientific theory in a case in which the scientific issue is not even presented. Nothing that appears in the court's opinion on this issue came from the parties, and I have no way of knowing whether what the court says is more right than wrong. Because the repressed memory discussion is dicta, when the *Frye* issue is properly presented on remand, neither the parties nor the trial court will be bound by the majority's resolution.

### II. The Factual Dispute and *Florez*

¶ 60 I agree with the court that the discovery rule applies to this case. I also agree that there is a genuine issue of material fact with respect to when the plaintiff discovered her claim. So, too, there is a genuine issue of material fact over her ability to have managed her affairs within the meaning of *Florez,* such that even after she did discover the claim, significant tolling occurred. That is all this case is about and it could have been simple enough to say that. Instead, the court tries to explain *Florez,* in a case in which there is no need to do so.

¶ 61 In *Florez,* we adopted the traditional rule that our court of appeals had already adopted in *Allen v. Powell's International Inc.,* 21 Ariz.App. 269, 270, 518 P.2d 588, 589 (1974). We acknowledged that "unsound

mind," meant that a person is unable to manage his affairs or to understand his legal rights. *Florez,* 185 Ariz. at 525, 917 P.2d at 254. People who are unable to manage their affairs or to understand their legal rights are typically protected in the law. For example, we generally conclude that they are unable to make wills, A.R.S. § 14–2501 (1995), and are often in need of the protection of guardians or conservators, A.R.S. § 14–5401(2)(a)(Supp.1997). But it is a failing of cognition, not volition. That is why we said that the "focus of the unsound mind inquiry is on a plaintiff's ability to manage his or her ordinary daily affairs. It does not focus on the plaintiff's ability to pursue the subject matter of the litigation at issue." *Florez,* 185 Ariz. at 525, 917 P.2d at 254. We said that the existence of hard evidence that a person was incapable of carrying on the day-to-day affairs of human existence was necessary to a finding of unsound mind within the meaning of the statute. This was because "[t]hese are empirical facts easily verifiable and more difficult to fabricate than a narrow claim of inability to bring the action." *Id.* at 526, 917 P.2d at 255. Drawing upon the views of the Supreme Court of Michigan, and the Report of the Council on Scientific Affairs of the American Medical Association, we concluded that this was a wise place to draw the line so that questions of cognition would not be confused with questions of volition. The best guide to whether somebody can understand his legal rights is how that person behaves, not what that person says he or she cannot do. Whether one is able to manage one's affairs is a sure guide to whether one is able to understand one's legal rights.

¶ 62 Contrary to what we said in *Florez,* the court now says that "the court of appeals limited its focus to whether Plaintiff was able to manage her daily affairs and ignored any relevance of the alternative inquiry into her ability to pursue the action—the second part of the *Allen* test." *Ante,* at ¶ 48. But the second part of the *Allen* test, as we have seen, is whether a person can understand his or her legal rights, not whether that person has the ability to pursue the action. For example, one could understand the right to make a will, but be incapable of confronting the issue of death. This is a failure of will [as it turns out, in both senses] not a failure to understand. Again, it is a question of cognition, not volition. Indeed, as the court discusses this matter, *ante,* at ¶¶ 48–52, sprinkled throughout are correct references to the "second part" as an ability to understand legal rights, not an ability to pursue an action. This will no doubt cause confusion and thus, in its effort to explain *Florez* in a case in which no explanation is necessary, the court creates an enormous uncertainty which will have to be resolved in a future case.

¶ 63 As the court acknowledges, *ante,* at ¶ 43, one of the claims in *Florez* did involve repressed memory. *Florez,* 185 Ariz. at 523, 917 P.2d at 252 ("he claims to have remembered these incidents," "Gomez moved for summary judgment on the statute of limitations defense arguing that it was tolled because ... (3) his memory was repressed"). The *Florez* holding, thus, was squarely intended to apply in all settings, including those in which there is a claim of repressed memory.

### III. Final Thoughts

¶ 64 Judicial self-restraint, deciding only what we must and what is before us, greatly increases the prospect of our doing more good than harm. Our task here is quite simple. We assume, without deciding, the legitimacy of repressed memory. We agree with the court of appeals that the discovery rule applies. Summary judgment is inappropriate because there is a fact issue regarding discovery. Summary judgment is inappropriate because, under *Florez,* there is a fact issue about Doe's ability to carry on her day-to-day affairs after remembering the events. The court's approach, however, ensures that we have not seen the last of this issue.