KLEINFELD, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority’s rejection of Stanley’s claims that his confession was inadmissible, and that his lawyer rendered ineffective assistance in the guilt phase of his trial. I respectfully dissent from the majority’s decision that Stanley is entitled to an evidentiary hearing on whether his lawyer rendered ineffective assistance in the penalty phase.
Federal evidentiary hearings on state habeas petitions are limited and discretionary.[1] This case shows one reason why. Murderers sentenced to death typically outlive many of the other participants at trial. Stanley murdered his wife and daughter in 1986 and the evidentiary hearing would take place, probably, in 2010, almost a quarter century later. Because the issue would be whether his lawyer rendered ineffective assistance, the focus would be on asking his lawyer what he did, what he did not do, and why he acted or refrained from acting as he did. That cannot happen, because Stanley’s lawyer is dead. There is nothing unusual about a lawyer of the level of experience adequate to defend death penalty cases dying in the quarter century following trial, nor is there anything unusual about the decades between trial and a favorable appellate decision in a § 2254 habeas case.[2] If the lawyers are still alive, it is a stretch to pretend that they remember everything, even if they have retained their ancient notes. And in this case, even if he were alive, the lawyer’s responses could not justify relief.[3]
In this case, Stanley did not even ask the district court to hold an evidentiary hearing on his claim. He had asked for *629 one in state court, so no doubt made a considered decision not to request one in federal court, perhaps because he had no useful evidence to present. The district court nevertheless considered granting such a hearing, and concluded “after reviewing the record, that none of Petitioner’s claims warrants evidentiary development because the allegations, even if true, do not entitle Petitioner to habeas relief.”[4] Yet somehow the majority concludes that the district court abused its discretion by not giving Stanley a hearing he did not ask for, and was not entitled to receive, at which findings would not entitle Stanley to relief. That is our error, not the district court’s.[5]
Facts
Stanley took his wife and two children for a ride, and murdered his wife and older child. He shot his wife dead with three shots, one to the left side of her head, one under her lips, one through the top of her head, with the muzzle planted on her skull.
And he murdered his five year old daughter. He put the muzzle of the gun on the top of her skull and pulled the trigger. The forensic pathologist testified that the shots Stanley fired through the tops of his wife’s and his daughter’s skulls were contact wounds, that is, the muzzle was touching their skulls.[6]
Significantly, Stanley spared the baby. His eleven month old son was sitting next to his daughter, but Stanley did not shoot this child. The .reason why affected his death sentence. Stanley shot his daughter because she otherwise might have testified against him, and spared his baby because the baby could not testify against him.
*630 After he killed them, Stanley dumped his wife’s and daughter’s corpses by pulling over to the side of the road, carrying each body to the edge, and dumping it. Then he drove home, showered with his clothes on to wash out the blood, and drove his car to his father’s repair shop to clean it out. He hid the bloody seat cover and blanket in the trash, but he missed a bloody sock. Then he took the baby, his wife’s purse, and some groceries home, stopping off on the way for some beer.
At home, Stanley changed the baby’s diaper, started a load of laundry, and put the baby to bed. Then he drove to a convenience store, rented a videotape, and set up a phony story. The store clerk remembered him because he rented one of the store’s few “racy” videos. Stanley asked if the clerk had seen a woman and little girl earlier that evening. When the clerk said he hadn’t seen them, Stanley remarked that his wife “must have gotten pissed off and taken off.” This was after he had murdered them, dumped their bodies, and washed away their blood, so he knew perfectly well that his wife had not “taken off.”
At around 11:30 pm, Stanley called his father and the police to report his wife and daughter “missing,” continuing the deception he had begun with the convenience store clerk. He told them his wife and daughter went for a walk with the family dog around 10:45 p.m. and had not returned. Stanley’s family and the police began searching the neighborhood.
The phony “must have gotten pissed off and taken off’ story fell apart the next day, when police found the bloody blanket and seat cover at the repair shop. The police brought Stanley in, and he confessed. Asked why he shot his daughter but not the baby, Stanley said it was “because she [the daughter] had seen what he had done,” but the baby “could not tell anybody what he had done.” In Stanley’s VCR, the police found the videotape the convenience store had described, stopped partway through.
The morning after his arrest, Stanley spoke with the jail psychiatrist, Karleen B. Hammitt, M.D. Dr. Hammitt concluded that Stanley was not insane, not psychotic, not even remorseful. Stanley told her that “he flew off the wall and shot them,” and “realized right away what he had done.” He also said that he felt “like he was watching and like he wasn’t really there” during the murders. Stanley denied ever having heard voices (i.e. no auditory hallucinations, tending to rule out psychosis). Dr. Hammitt said Stanley “never volunteered any comments about remorse or, you know, if I had just done this or that differently or gotten treatment for my drinking problem or done anything different,” during his meetings with her. Although Stanley cried a great deal during their initial meeting (48 hours after the murders), Dr. Hammitt told the defense investigator that “[n]othing [Stanley] said indicated to me any degree of remorse per se.”[7]
*631 Stanley was charged with first degree murder for the deaths of his wife and daughter. During the guilt phase of his trial, Stanley sought to avoid conviction for first degree murder by arguing that: (1) the police conducted a sloppy investigation resulting in only circumstantial evidence; (2) the police coerced Stanley’s confession; (3) Stanley lacked the capacity to premeditate or deliberate, having been too high and too drunk at the time to form the requisite intent; and (4) Stanley met the legal test for insanity. In support, the defense called two mental health experts. One thought Stanley had suffered a “dissociative reaction” and may have met the M’Naughten test for insanity at the time of the murders. The other thought a dissociative reaction was “unlikely,” but could not rule it out.
The jury nevertheless convicted Stanley of first degree murder for the deaths of his wife and five-year-old daughter. After reviewing the entire file and all the testimony, the judge imposed a sentence of life imprisonment for the murder of Stanley’s wife. The judge imposed a sentence of death for the murder of Stanley’s five-year-old daughter.[8]
The judge based his decision to sentence Stanley to death for the murder of his five-year-old daughter (not his wife) on a combination of aggravating circumstances: (1) Stanley killed his daughter because she had witnessed him murder her mother and could tell what she had seen; (2) Stanley did not kill the baby because the baby was too young to talk about what he had seen; (3) the execution-style contact wound on Stanley’s daughter’s skull; (4) the brutality and senselessness inherent in killing one’s own family; (5) the testimony of the video store clerk indicating that Stanley did not appear to be under the influence of alcohol or drugs; and (6) the type of video Stanley rented shortly after hiding the evidence of his brutal crime. From this evidence, the judge concluded that Stanley’s decision to kill his daughter was the product of an intelligent, rational calculation, and showed the requisite heinousness and depravity to impose a death sentence. Here is the sentencing judge’s explanation:
The Court will first note that it is convinced beyond a reasonable doubt that Defendant did state that he had killed his daughter because she had seen what he had done and that his son was too young to talk about what he had seen. The Court is likewise convinced beyond a reasonable doubt that when Defendant made these statements to the officers they were made entirely voluntarily and is further convinced beyond a reasonable doubt that these statements reflect the true state of mind of Defendant at the time of these murders.....
When Defendant’s statements are considered together with Dr. Keen’s testimony that the shooting of Susan Stanley was accomplished at very close range, including one contact wound, and the shooting of Selest Stanley was with a single hard contact wound, the Court has concluded that Defendant deliberately excluded Chad from any danger based on his intelligent and rational conclusion that Chad could not relate to anyone what Defendant had done. ...
Heinousness and depravity involve the killer’s mental state and attitude at the *632 time of the killing. In State v. Gretzler, 135 Ariz. 42, 659 P.2d 1 (1983), our Supreme Court set forth a list of specific factors which could lead to a finding of heinousness or depravity. These factors included the senselessness of the crime and the helplessness of the victim. In addition, our Court in State v. Gillies, 142 Ariz. 564, 691 P.2d 655 (1984) stated that elimination of a witness as a motive for murder also illustrates heinousness and depravity.
Addressing first the motive for the killing, as noted above, the Court is convinced beyond a reasonable doubt that Defendant murdered Selest to eliminate her as a witness.
Addressing next the senselessness of the crime and helplessness of the victim, instructive in this regard is the recent case of State v. Wallace, 151 Ariz. 362, 728 P.2d 232 (1986). Here the Defendant brutally murdered a mother and her two children. As noted by the Supreme Court, Defendant committed these acts despite the fact that he claimed to have loved these people and that he had lived with them as a family for more than two years. Focusing in specifically on the children, the Court stated:
“Moreover, the fact that Defendant killed two children, with whom he admittedly had no dispute and who posed no danger to him is additional evidence of his ‘shockingly evil state of mind.’ (Citation omitted) We therefore find that the statutory aggravating factor of heinous and depraved is present in the instant case.” 151 Ariz. at page 368, 728 P.2d 232.
Finally bearing on Defendant’s state of mind is the videotape testified to. According to the testimony of Mr. Cook, within just a short time after the killings, disposal of the bodies and attempts to hide evidence, Defendant was at Mr. Cook’s place of business to rent a “racy” videotape, identified by Officer Saravo later as entitled “Best of Anything Goes”, a video dealing with a strip game show. Defendant did not appear to be under the influence of alcohol or any drug at the time he rented this videotape and apparently some time in the next twenty-four hours before he was arrested had watched part of it.
When these factors are considered together, they paint the picture of a man so depraved that he could kill his helpless 5 year old child, who was completely dependent on him and trusting of his goodwill toward her, kill her for no reason other than to eliminate her as a witness, and then, after rolling her body down a mountainside, sought to idle away his time by indulging himself in watching a strip game show. Beyond a reasonable doubt, the State has proven that Defendant committed the murder of Selest Dawn Stanley in an especially depraved manner.
As is plain from the judge’s remarks, he viewed Stanley’s murder of his daughter as a cold-blooded execution of a witness to keep her from talking, and that was the most central fact on the judge’s mind in passing sentence. That would not have changed if the defense experts had supplemented their mental state testimony with Stanley’s remark that “he felt like he was watching and like he wasn’t really there.” And that is all that we are talking about.[9] *633 We lack authority to substitute our view for the state sentencing judge’s on whether Stanley should be executed for murdering his daughter.
Analysis.
I. Standard of review.
The district court had discretion, bounded by standards, whether to grant an evidentiary hearing. “In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition’s factual allegations, which, if true, would entitle the applicant to federal habeas relief.”[10] Under AEDPA, the district court’s deference was also bounded by the deference it owed to the state court,[11] and our review is bounded by the additional deference we owe to the district court.[12] We have no warrant to jump over this triple deference.
As the majority correctly points out, habeas relief for ineffective assistance requires two things: deficient performance by the attorney under the Strickland v. Washington standard, and prejudice.[13] Ineffective assistance of counsel in violation of the Sixth Amendment is representation that falls “below an objective standard of reasonableness” in light of “prevailing professional norms” at the time of the representation.[14] Counsel’s actions are reviewed with a “ ‘strong presumption’ that counsel’s conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.”[15] The Supreme Court has stated that “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”[16]
*634 Deficient performance by the attorney is not enough, however, to establish a Sixth Amendment violation. The petitioner must also establish that he was prejudiced by the attorney’s deficient performance. The prejudice standard is “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings might have been different.”[17] Wong v. Belmontes[18] holds that we cannot consider merely the best evidence the defense might have presented, but instead must consider all of the evidence that would have come into a penalty phase of a trial (both mitigating and aggravating) if the lawyer had made a different choice.[19]
Thus, to reverse, we have to conclude that (1) Stanley’s lawyer’s conduct in not showing his expert witnesses the notes of what the jail psychiatrist said (Stanley’s “felt like he was watching” remark) fell below an objective standard of reasonableness, almost impossible since it was strategic; (2) the judge might have sentenced Stanley to life imprisonment instead of death had he heard Stanley’s experts testify after they had been informed by the jail psychiatrist’s observations; (3) the state court’s decision to the contrary was not merely incorrect but went beyond error to being “objectively unreasonable;”[20] (4) even though Stanley’s habeas lawyer did not ask for an evidentiary hearing, the district judge abused his discretion by not conducting one anyway to determine whether the state court’s ineffective assistance decision was objectively unreasonable. The record does not support a single one of these requirements for reversal.
II. Deficient performance.
Because “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,”[21] the state court cannot fairly be said to have unreasonably applied Strickland in determining that Stanley’s lawyer’s decision fell below “the wide range of reasonable professional assistance];.]”[22]
There is no claim that Stanley’s lawyer failed to investigate, or failed to discover, some sort of available psychological or psychiatric evidence. Stanley’s theory is that, knowing full well just what the jail psychiatrist had observed, his lawyer should have provided the jail psychiatrist’s notes and the transcript of his own investigator’s interview with the jail psychiatrist to the two witnesses who testified for the defense about Stanley’s mental condition.
The first question to be answered, applying Strickland to this case, is whether not providing the notes was strategic, because “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”[23] The record admits of but one answer, yes. Stanley’s lawyer made an in limine motion to keep the jail psychiatrist’s evidence out of the trial, on the ground that it was protected *635 by the physician-patient privilege. The prosecution wanted her to testify, and the defense did not. Stanley prevailed in keeping her out. As the state court observed,[24] he did so for the purpose of keeping the jury from hearing her unfavorable opinion that Stanley was neither psychotic nor remorseful.
The state court reasonably concluded that if Stanley had disclosed Dr. Hammit’s interview or notes to third parties (the defense experts), Stanley would have waived the physician-patient privilege and could not have later successfully reasserted it.[25] Thus the jail psychiatrist could have testified. In addition, her opinion that Stanley was not psychotic and showed no remorse could have been brought out by prosecution cross examination of Stanley’s own experts.[26] He would have obtained one very bad prosecution witness and compromised his own two witnesses, had he disclosed the jail psychiatrist’s information to his own witnesses.
Dr. Hammit’s statements are devastating to Stanley’s case. Dr. Bindleglass testified for the defense that Stanley suffered a dissociative reaction, resulting in such marked impairment that Stanley was “truly incompetent” at the time of the murders. Dr. Buñuel testified that Stanley showed remorse, and may have suffered a dissociative reaction. The jail psychiatrist, who saw Stanley the morning after he was arrested, came to the opposite conclusions. She told the defense investigator that Stanley suffered from depression and she had advised the jail authorities to consider him at risk for self harm. Stanley told her that his wife had been yelling at him about his drinking, he flew off the wall, and he realized immediately what he had done. He had never heard voices, and she “found no indicators of psychotic thought process.” “There were no non sequiturs in his speech,” nothing “really off the wall” or “unrelated to what we were talking about,” “really nothing to make me think that there was a psychotic process going on.” Additionally, she noted that Stanley “never volunteered any comments about remorse.”
The single remark by Dr. Hammitt that the majority thinks would have turned the whole case around had Stanley’s lawyer disclosed it to the defense experts was “he said it was like he was watching and like he wasn’t even there.” Asked if she thought that indicated psychosis, Dr. Ham-mitt said: “No. I thought it probably had something to with whatever state of intoxication he was involved in at the time as well as the fact that most people don’t ever believe that they themselves are going to be in the situation like he found himself in when he sobered up.” Thus Dr. Hammitt rejected the defense experts’ conclusion that this comment was evidence of a dissociative reaction. Dr. Hammitt considered the statement “within the continuum of things that are experienced by a person who is intoxicated.”
It is hard to imagine a reason why, if he could keep this devastating evidence out, defense counsel would not do so. And he *636 did. Before trial, defense counsel filed a motion in limine to exclude “the entirety of testimony, notes, materials, and reports secured, prepared, utilized and/or including the actual presence of’ Dr. Hammitt, “in any aspect whatsoever of the case concerning Milo Stanley” based on the patient-physician privilege.
Before the penalty phase, defense counsel reminded the court of his successful in limine motion and moved to strike references to Dr. Hammitt’s opinion from the presentence report. Thus keeping it out at sentencing was also a considered decision, not an oversight. The court granted the defense request. It then ordered both parties to refrain from citing or referring to Dr. Hammitt during the penalty phase. Dr. Hammitt’s evidence, had defense counsel not succeeded in getting it stricken, would have tended to establish absence of remorse, absence of psychosis, and absence of “dissociative reaction” beyond what normal people have when they realize they have put themselves in a terrible situation.
Because the “possible harm to the defense which could [have been] caused by use of Dr. Hammitt’s interview outweighed the possible benefits the use of the interview might produce,” the state court concluded that counsel’s “determination not to waive the physician-client privilege was a matter of reasoned trial strategy and does not present a colorable claim that trial counsel was ineffective for failing to do so.” It further found that Dr. Hammit’s interview “could have undermined the [defense’s] claim of dissociative reaction.” This is a sound application of the Strickland principle that “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.”[27]
Capable lawyers evaluate not only what they ought to do, but what they ought not to do. Where action on behalf of a client has a considerable likelihood of backfiring, they avoid it.[28] Just as lawyers have no duty to pursue defenses likely to fail,[29] and no duty to pursue investigations likely to be “fruitless or even harmful,”[30] they have no duty to inject evidence likely to open the door to additional evidence that would be harmful. Much of the strategic thinking a good lawyer does during a trial is about whether something helpful he would like to put in will open the door to something harmful his adversary will then be able to inject. Decisions not to open the door are “sound tactical reasons” for not calling a witness or presenting certain evidence.[31] Had Stanley’s attorney disclosed what Dr. Hammitt had said to his expert witnesses, he would have opened the door to devastating rebuttal testimony by Dr. *637 Hammitt. His strategic decision not to do so is “virtually unchallengeable”[32] and, far from the state court’s rejection of his deficient performance claim being unreasonable, it is our own majority opinion that unreasonably applies Strickland.
III. Prejudice.
Even if we pretend that any reasonable lawyer would have educated his experts with Dr. Hammitt’s devastating opinion and opened the door to it at sentencing, Stanley would still have to surmount the impossible hurdle of showing that the sentence might have been different had he done so. That would require a record different from what we have, perhaps a sentencing judge who had said “if only I had seen some evidence that Stanley had a drinking problem or a fight with his wife or was depressed, then I would not sentence him to death for the murder of his little girl to keep her from talking.” Stanley’s argument seems to be that, had his experts known that he told the jail psychiatrist that he flew off the handle when his wife criticized his drinking, and felt “like he was watching and like he wasn’t really there,” his own experts might have persuaded the judge that he murdered his daughter because of a mental defect, even though the judge would also have known that Dr. Hammitt thought Stanley was remorseless, mentally normal except for depression, and not psychotic.
That is not a plausible possibility, in light of what the sentencing judge said. He decided to give Stanley the benefit of the doubt on whether he had any remorse, and considered remorse as a mitigating factor (persuasive for the murder of Stanley’s wife), but Dr. Hammitt’s evidence would have made that less likely. Stanley’s problem establishing prejudice is that even if his own expert witnesses would have testified differently, the sentencing decision was not theirs to make, so improving their testimony but not the judge’s decision would be fruitless. It is not enough for the petitioner to show that counsel’s error had “some conceivable effect on the outcome.”[33] Stanley must show “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings might have been different.”[34] The sentencing judge’s remarks demonstrate that the outcome would have been the same.
The sentencing judge was “convinced beyond a reasonable doubt that Defendant did state that he had killed his daughter because she had seen what he had done and that his son was too young to talk about what he had seen.” Together with his five year old daughter’s helplessness and the contact of Stanley’s gun’s muzzle with the top of her skull, he concluded that her murder was extremely heinous and depraved. Throwing the dead bodies of his wife and child and renting the “racy” videotape shortly afterwards contributed to this evaluation. Based on the convenience store clerk’s testimony as well as the other facts, the judge did not think Stanley was too drunk to know what he was doing. Stanley got his death sentence because of what he did to his daughter. Disclosure of what he told the jail psychiatrist to his defense experts would not have changed what Stanley did, and what he did persuaded the judge to impose a death sentence.
*638 Conclusion
An evidentiary hearing on whether Stanley’s lawyer rendered ineffective assistance in this case is going to be a very odd proceeding. Because Stanley’s lawyer is dead, he cannot be asked to fall on his sword and testify about what a bad lawyer he was for not giving Dr. Hammitt’s notes and interview to his expert witnesses. Habeas counsel may be able to produce an expert witness to testify that any competent lawyer would have done so, and will be able to have his two experts testify in accord with what they say in their affidavits, that it would have made a difference to what they said. But even in the unlikely event that all this persuades the district judge that Stanley’s lawyer did so bad a job that it was deficient despite being strategic, such a finding would be of no significance, because prejudice cannot be established. We already know the answer about whether the lawyer’s putatively deficient performance might have made a difference, because the record establishes that the judge sentenced Stanley to death for executing his daughter to keep her from talking. We do not have a legal justification for doing anything but affirming, because established habeas law precludes the federal courts from granting a writ against this state sentence.

. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

. See, e.g., Sechrest v. Ignacio, 549 F.3d 789 (9th Cir.2008) (twenty-five years passed between state court conviction and grant of federal habeas relief); Frierson v. Woodford, 463 F.3d 982, 985 (9th Cir.2006) (twenty-eight years passed between state court conviction and grant of federal habeas relief); Landrigan v. Schriro, 441 F.3d 638 (9th Cir.2006) (eighteen years passed between state court conviction and grant of federal habeas relief), rev’d, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

. The majority finds my comment about the passage of time "disturbing” because of "the increasing frequency with which innocent people have been vindicated after years of imprisonment.” See Majority Opinion at 623. I can think of few tasks more important than freeing innocent people who have been wrongly imprisoned. Stanley does not claim to be among the innocent. The majority does not suggest any possibility that he is innocent.
The delay matters here because the only issue is what may seem to be an unspoken rule in our circuit that anyone sentenced to death had ineffective assistance of counsel during the sentencing phase of his trial or at least needs an evidentiary hearing decades after sentencing to find out. See, e.g., Pinholster v. Ayers, 590 F.3d 651 (9th Cir.2009) (en *629 banc); Belmontes v. Ayers, 529 F.3d 834 (9th Cir.2008), reversed, Wong v. Belmontes, — U.S. -, 130 S.Ct. 383, - L.Ed.2d - (2009); Landrigan v. Schriro, 441 F.3d 638 (2006), reversed, Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). My colleagues and I share a concern with getting accurate results from the courts to avoid wrongful imprisonment of the innocent. We also ought to share a concern with getting accurate and reliable results on whether lawyers rendered ineffective assistance, a task best accomplished when the lawyers who rendered the assistance are alive to explain what they did and why they did it. I do not suggest that the delay is Stanley's fault. My point is that the decades preceding an evidentiary hearing on what his lawyer did and why make the hearing unreliable where the lawyer cannot testify because he is dead.

. Stanley v. Schriro, No. CV-98-0430, 2006 WL 2816541, at *33 (D.Ariz. Sept. 27, 2006).

. See Landrigan, 550 U.S. at 481, 127 S.Ct. 1933 (reversing the Ninth Circuit and holding that a district court did not abuse its discretion in refusing to grant an evidentiary hearing to death row inmate where it determined that, even assuming the truth of all facts respondent sought to prove at the hearing, respondent was not entitled to federal habeas relief because the evidence respondent sought to introduce would not have changed the result).

.The majority opinion suggests that the heinous details of the two murders are immaterial to the merits of the legal issues. That argument is mistaken. The heinous details were why the judge sentenced Stanley to death. Our critical question is whether the trial judge would have sentenced Stanley to death if at the penalty phase the trial judge had heard Stanley's statements to Dr. Ham-mitt, as well as the opinion from two doctors, instead of one doctor, that Stanley had a dissociative reaction. The details of the murder of the daughter together with the sentencing judge's comments on that murder provide the answer. The trial judge had already heard testimony from one of these two doctors that Stanley had a dissociative reaction, and from the other doctor that Stanley might have had a dissociative reaction. Having heard this testimony, the trial judge nevertheless sentenced Stanley to death because of the close-range execution style of the killings, and because he killed his daughter in order to eliminate her as a witness to her mother’s murder.

. The majority opinion suggests that Dr. Hammitt's statements that "[njothing [Stanley] said indicated to me any degree of remorse per se” and that he “never volunteered any comments about remorse” are "a far cry from a definitive statement that Stanley lacked remorse.” See Majority Opinion at 617. The majority evidently would infer remorse despite what Dr. Hammitt said, because Stanley cried. I read Dr. Hammitt as taking special note that Stanley did not say a word indicating that he was remorseful. As for his crying, that could be for his wife and daughter, whom he had murdered, or himself, and Dr. Hammitt’s discussion appears to have meant to the sentencing judge that Stanley was not crying out of remorse for murdering his wife and daughter.

. In 1986 when Stanley was sentenced to death, Arizona death sentences were imposed by the judge, not the jury. The Supreme Court held in Ring v. Arizona that the Constitution precludes that procedure. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The Court subsequently decided that Ring does not apply retroactively to cases such as this one where the convictions and sentences were final when Ring was decided. Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

. The majority suggests that my view minimizes the effect of Stanley’s remark on the penalty phase of the trial. Majority Opinion at 624-25. Rather, I believe that the majority mischaracterizes the effect of the remarks on the defense experts' positions by saying that this information "would have completely changed their testimony in Stanley’s favor[J” *633 Majority Opinion at 624-25. Dr. Bindleglass states that he would have testified that Stanley had a dissociative reaction, but that was already his position at trial. Dr. Buñuel states that he would have opined that Stanley had a dissociative reaction, as opposed to his position at trial that Stanley might have had a dissociative reaction. The state superior court judge, not Dr. Bindleglass or Dr. Buñuel, had sentencing responsibility. It is clear from the sentencing judge’s remarks that Dr. Buñuel's change from “might have had” to "did have” a dissociative reaction would not have changed the sentencing judge's mind. The sentencing judge commented on various aspects of the evidence, but not this one. His explanation for the sentence focused on murder of Stanley’s helpless child because she might otherwise be a witness, not on the psychological underpinnings of Stanley's conduct. The trial judge was thus already presented with defense expert testimony regarding the dissociative reaction theory, and nevertheless sentenced him to death for the reasons discussed at length above. Moreover, we cannot only consider how Dr. Ham-mitt's statements might have been favorable to Stanley in the sentencing phase, but also how Dr. Hammitt’s statements may have had hurt Stanley in the sentencing phase.

. Landrigan, 550 U.S. at 474, 127 S.Ct 1933.

. See 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

. Landrigan, 550 U.S. at 468, 481, 127 S.Ct. 1933 (reviewing for abuse of discretion the district court’s decision not to grant an evidentiary hearing).

. Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. Id. at 686, 104 S.Ct. 2052; see also Bobby v. Van Hook, - U.S. -, 130 S.Ct. 13, 16-17, 175 L.Ed.2d 255 (2009).

. Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052).

. Knowles v. Mirzayance, — U.S. -, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

. Wong v. Belmontes, - U.S. -, 130 S.Ct. 383, 386, — L.Ed.2d - (2009) (quoting Strickland, 466 U.S. at 693, 104 S.Ct. 2052).

. - U.S. -, 130 S.Ct. 383, - L.Ed.2d - (2009).

. Id. at 386.

. Williams, 529 U.S. at 409-10, 120 S.Ct. 1495; see also Woodford v. Visciotti, 537 U.S. 19, 22, 123 S.Ct. 357, 154 L.Ed.2d 279 (2003).

. Knowles, 129 S.Ct. at 1420 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

. Knowles, 129 S.Ct. at 1420 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

. State v. Stanley, No. CR 11909, at *7 (Ariz. Superior Ct. Yavapai County May 20, 1997) (order denying state habeas petition).

. See State v. Mincey, 141 Ariz. 425, 687 P.2d 1180, 1194 (1984).

. Ariz. R. Evid. 705 (“The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.”); State v. Hummert, 188 Ariz. 119, 126, 933 P.2d 1187, 1194 (Ariz.1997) ("It is well established in Arizona that the basis for an expert's opinion is fair game during cross-examination.”).

. Knowles, 129 S.Ct. at 1420 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

. Cf. Osborne v. State, 110 P.3d 986, 991 (Alaska App.2005) (holding that where defense counsel believed client was guilty and there was a substantial risk that test would prove the prosecution's case, counsel's decision not to obtain highly discriminating DNA test was not ineffective assistance of counsel under Alaska law) (discussed in District Attorney’s Office for Third Judicial Dist. v. Osborne, - U.S. -, 129 S.Ct. 2308, 2314, 174 L.Ed.2d 38 (2009)).

. Knowles, 129 S.Ct. at 1420-22; see also Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.1994).

. Eurger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052).

. See Bell, 535 U.S. at 700-01, 122 S.Ct. 1843; see also Williams v. Woodford, 384 F.3d 567 (9th Cir.2004) (holding that when mitigating evidence is "not especially helpful” and “would open the door to damaging rebuttal evidence,” it is reasonable for counsel to decide not to present it).

. Knowles, 129 S.Ct. at 1420 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

. Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis added).

.Id. at 693, 104 S.Ct. 2052.